Slip Op. 06 - 55

# *UNITED STATES COURT OF INTERNATIONAL TRADE*

—————————————————————————
                              :

DOUG SELIVANOFF,                 :

                              :

                Plaintiff,       :

                              :

                  v.           :      **Before: MUSGRAVE, Judge**

                              :      Court No. 05-00374

UNITED STATES SEC'Y OF AGRICULTURE, :

                              :

                Defendant.     :

—————————————————————————:

[Negative trade adjustment assistance determination by Foreign Agricultural Service remanded for additional proceedings.]

Decided: April 18, 2006

*Doug Selivanoff*, plaintiff *pro se*.

    *Peter D. Keisler*, Assistant Attorney General; *David M. Cohen*, Director, *Patricia M. McCarthy*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*David S. Silverbrand*); *Jeffrey Kahn*, Office of the General Counsel, U.S. Department of Agriculture, for the defendant.

### OPINION AND ORDER

    The plaintiff, Doug Selivanoff, fisher of Alaska salmon, contests the denial of his application for trade adjustment assistance (TAA) cash benefits under 19 U.S.C. § 2401e by the United States Department of Agriculture, Foreign Agricultural Service (FAS). His trade or business consumed approximately 2100 hours per year during an eight-month fishing season for little more than $19,025 in the "pre-adjustment" year of 2001 as compared with $25,390 for 2003, both of which he duly reported as "ordinary income (loss)" for his "S" corporation Bear Fisheries Ltd. *Cf.* Pub R. at 7, 11, 13. The government argues that FAS's determination is correct and should be sustained. The

specific issue on this appeal is whether Mr. Selivanoff's "net fishing income" declined over the pre-adjustment year of 2001. For the following reasons, this matter will be remanded to FAS for further proceedings not inconsistent with this opinion.

### *Jurisdiction; Standard of Review*

The Court has jurisdiction over this matter pursuant to 19 U.S.C. § 2395. FAS's findings of fact will be considered conclusive if supported by substantial evidence on the record. 19 U.S.C. § 2395(b). Substantial evidence is "more than a mere scintilla" of evidence, it means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). It "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the [same] evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citations omitted). In the absence of substantial evidence or for good cause shown, the matter will be remanded for further proceedings. *See id.* Further, "[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret . . . statutory provisions, . . . determine the meaning or applicability of the terms of an agency action[,]" and set aside agency action found to be *inter alia* "not in accordance with law." 5 U.S.C. § 706. *See* 5 U.S.C. § 702; *Bowen v. Massachusetts*, 487 U.S. 879, 911 (1988).

### *Background*

In order to gain approval, an application for TAA cash benefits must demonstrate that the adversely affected commodity producer's "net farm income (as determined by the Secretary) for the

most recent year is less than the producer's net farm income for the latest year in which no adjustment assistance was received by the producer[.]" 19 U.S.C. § 2401e(a)(1)(C). The relevant implementing regulation expanded upon that authority[1] by including a definition of "net fishing income":

> Net fishing income means net profit or loss, excluding payments under this part, reported to the Internal Revenue Service ["IRS"] for the tax year that most closely corresponds with the marketing year under consideration.

7 C.F.R. § 1580.102 (Nov. 1, 2004).

---

[1] Section 141 of the Trade Act of 2002 amended title II of the Trade Act of 1974 to authorize the Secretary of Agriculture to provide TAA cash benefits for an adversely affected "agricultural commodity producer." Pub. L. 107-210, 116 Stat. 933, 946-952 (2002). *See* 19 U.S.C. § 2401(2). The amendment described "agricultural commodity producer" as a "'person' as prescribed by regulations promulgated under section 1001(5) of the Food Security Act of 1985 (7 U.S.C. § 1308(e))." *See* 7 C.F.R. § 1400.3. Such definition did not specify fishermen; however, Section 143 of the Trade Act of 2002 directed the Secretary of Commerce to study and report to Congress "whether a trade adjustment assistance program is appropriate and feasible for fishermen . . . [assuming] the term 'fishermen' means any person who is engaged in commercial fishing or is a United States fish processor." 116 Stat. at 953. FAS then published proposed 7 C.F.R. Part 1580 in order to develop regulation of TAA for agricultural commodities producers. In response, it received numerous comments supporting extension of TAA to fishers of "wild Alaska salmon, who face stiff competition from imported farm-raised salmon." *See Trade Adjustment Assistance for Farmers*, 68 Fed. Reg. 50048, 50049 (Aug. 20, 2003). Some commenters argued for extending TAA to "all fishermen" but FAS concluded that extending TAA to "all fishermen" would be incompatible with the aforementioned Section 143. *Id*. FAS decided instead to extend TAA coverage to "aquaculture," defined "to include products propagated and raised in controlled environments for the purpose of human consumption, and it covers fishermen whose catch is adversely affected by imported aquaculture products." *Id*. On October 28, 2003, the FAS found that due to imports of salmon, the landed prices for Alaska salmon declined by 34.6% over the preceding five-year average. *Trade Adjustment Assistance for Farmers*, 68 Fed. Reg. 62766 (Nov. 6, 2003). FAS therefore certified a TAA petition filed by Alaska fishermen for TAA benefits. *Id*. Adversely affected agricultural commodity producers such as Mr. Selivanoff were thus eligible to file for cash benefits within 90 days after issuance of the certificate of eligibility. *See* 19 U.S.C. § 2401e. Subsequently, on September 23, 2004, FAS re-certified the petition after finding that landed prices for Alaskan salmon remained below the 80 percent threshold. *See Trade Adjustment Assistance for Farmers*, 69 Fed. Reg. 60350 (Oct. 8, 2004). A year later, on October 6, 2005, FAS de-certified the petition from eligibility. *See Trade Adjustment Assistance for Farmers*, 70 Fed. Reg. 60487 (Oct. 18, 2005).

In his individual capacity, Mr. Selivanoff initiated a timely application for TAA benefits on January 5, 2005. *See* Pub. R. at 1. In a letter accompanying the application, dated January 3, 2005, Mr. Selivanoff explained[2] his situation as follows:

> In 2001 we had a bigger gross stock than in 2003. I did however have more expenses in 2001 (primarily a repair on the bow of the boat[)]. On my Bear Fisheries Ltd. tax return form 1120S Line 9, in 2001 I had $19,815 versus in 2003 [$]6,890, difference of $12,925.00.
>
> On Line 32 schedule E in 2001 the total was 17,836[;] in 2002 the total was 23,594, a difference of 5,758.00. If the repairs were the same in 2001 & 2003 I would of made in 2001 over $7,000 more dollars. It doesn't seem quit right that I wouldn't qualify because of necessary maintenance.

Pub. R. at 3.

At the bottom of the application are four questions to be answered by the local Farm Service Agency that ask whether the applicant has provided proof of adjusted gross income less than $2.5 million, "production" of the "commodity," receipt of technical assistance, and "supporting documentation verifying that the . . . net fishing income declined from the petition's pre-adjustment year?" *See* Pub. R. at 1. Regarding the last item, the case officer of the local Farm Service Agency office checked "No" on January 13, 2005, albeit with respect to the column headed "Date Documentation Received." *Id.* The application relied on certain documentation in respect of Mr. Selivanoff's application for TAA benefits for the prior period, including completion of technical assistance on March 19, 2004. *See id.* at 4-10.

Mr. Selivanoff's completed application was forwarded to FAS on May 5, 2005. *See* Pub. R. 1, 62. It included two IRS 1120S forms (U.S. Income Tax Return for an S Corporation) for the 2001

---

[2] The text of plaintiffs' submissions are transcribed verbatim hereinafter with only minor alterations for the sake of clarity.

and 2003 years. *Id*. at 11, 13. Those documents show "ordinary income (loss) from trade or business activities" in the amounts of $19,025 and $25,390, respectively. *Id*. FAS denied Mr. Selivanoff's application for TAA on April 1, 2005. The letter explained: "You have been denied a TAA cash benefit because the documentation you provided the Farm Service Agency indicates that your 2003 net fishing income was greater than your 2001 net fishing income." Pub. R. 62. The letter also informed that the disapproval was final and that Mr. Selivanoff could seek review in this Court. *Id*.

Proceeding *pro se*, Mr. Selivanoff wrote to the Court by letter dated May 23, 2005 to seek review of the adverse determination. The Clerk of the Court deemed the letter as fulfilling in principle the requirements of a summons and complaint for the commencement of a civil action, and copies were served upon FAS and the United States Department of Justice. The government filed its answer on July 25, 2005. After the matter was assigned to these chambers, Mr. Selivanoff filed a letter that was deemed a motion for judgment on December 7, 2005. The government responded on January 13, 2006, and Mr. Selivanoff filed his reply on February 13, 2006.

### *Discussion*

Mr. Selivanoff's TAA application describes "necessary maintenance" to his boat for the 2001 year as distorting his "normal" income. *Cf*. Pub. R. at 3 ("[i]f the repairs were the same in 2001 & 2003 I would of made over $7,000 more dollars"). In his letter to the Court of November 30, 2005, he elaborated as follows:

> If we start with my gross (and I mean gross) stock the simplest figure in 2001 our stock was $130,954.00 we caught 700,000 pounds of Salmon.

In 2003 our stock was $128,795.00 and we caught 1.1 million pounds indicating a reduction of fish price by over 30%. Now we have two figures that indicate a drop from 2001 to 2003, our gross stock and fish price (we lost pricing power).

At this point the denial of these benefits have penalized me for working harder and trying to make the most of a bad situation. My so-called increase in income in 2003 has come from several things.

1)    In 2001 a storm got me and I incurred $19,815 in damages, I guess I was lucky to be alive, had this happened in 2003 you would of never heard from me because I would qualify.

2)    In 2003 I reduced my crew by one, I increase my workload by 25%. Grub and Insurance costs dropped in 2003 because of the reduction of crew. Increasing my profits but the workload increased.

3)    By 2003 my boat had pretty much been depreciated out. In 2001 my depreciation was $4,135.00 and in 2003 it was $812.00

* * * * *

I appeal to you not to look at some line item but to look at the bigger picture here. In 2003 we worked harder, caught more fish but made less money than in 2001, it is that simple.

Doc. R. 1.

Would that it were. Apparently referencing the impact upon financial statements of extraordinary expenses and noncash matters, it appears Mr. Selivanoff's argument is that his net profit for 2001 as shown on line 21 of IRS form 1120S does not provide an accurate baseline figure against which to evaluate his net profit for 2003, which FAS has implicitly determined constitutes his "net fishing income," also defined as "net profit or loss." *See* 19 U.S.C. § 2401e(a)(1)(C); 7 C.F.R. § 1580.102. The government urges judicial deference to FAS's interpretation of net fishing income as reasonable.

Net fishing income is what distinguishes a producer harmed by import competition and entitled to cash benefits. Decisions to date have emphasized that Congress clearly delegated to the Secretary of Agriculture the authority to determine "net farm income," from which the Court's decisions have uniformly concluded that FAS's interpretation of "net fishing income" as including all commercial fishing income sources and excluding non-fishing sources of income has been reasonable. *E.g. Steen v. Sec'y of Agriculture*, 395 F. Supp. 2d 1345 (CIT Oct. 3, 2005); *Cabana v. U.S. Sec'y of Agriculture*, Slip Op. 05-93 (CIT Aug. 1, 2005), *sust'd after remand* Slip Op. 06-27 (CIT Feb. 28, 2006) (negative determination sustained). It bears repeating, however, that Congress mandated that the Secretary *determine* net farm income, not merely determine the *meaning* of net farm income; rote reliance upon a single line item "reported to the Internal Revenue Service" without further analysis or, as necessary, further investigation will not suffice. *Cf. Rood v. U.S. Sec'y of Agriculture*, Slip Op. 05-112 (CIT Aug. 29, 2005), *sust'd after remand* Slip Op. 06-31 (CIT Mar. 1, 2006) (benefits awarded); *Do v. U.S. Sec'y of Agriculture*, Slip Op. 06-29 (CIT Feb. 28, 2006) (capital gain not reported on Schedule C was therefore not included in "net fishing income" determination); *Trinh v. U.S. Sec'y of Agriculture*, 395 F. Supp. 2d 1259, 1271-1272 (CIT Aug. 29, 2005) (remanded due to inadequate investigation of claim involving "bigger repairs on the boat in 2001" as compared to 2002 in light of amended tax return filing). *Steen* and *Cabana* upheld FAS's interpretation to consider overall net "fishing income" as the relevant determinant, while *Rood*, *Do* and *Trinh* demonstrate that it is appropriate to exclude "non-fishing income" items therefrom. Implicit in all decisions is recognition of the need to make apples-to-apples comparisons between the claim year and pre-adjustment year figures.

In the TAA context, "net" means "[f]ree from, or not subject to, any deductions; remaining after all *necessary* deductions have been made." *Oxford English Dictionary*, vol. X, p. 340 (2d ed. 1989) (italics added). The question remains: net of what? If Mr. Selivanoff is arguing that FAS erred because it failed to exclude, or at least consider, extraordinary expenses items in its determination of his net fishing income, the argument has a certain appeal, because a single profit or loss figure does not provide a complete picture of all of the factors affecting the change in a person's financial status, which is the object of the comparison in subparagraph 2401e(a)(1)(C). A single profit or loss figure is, by definition, intended to be net of all relevant influences. Those may or may not include noncash and extraordinary expenses, such as capital gains or losses, depending upon the perspective sought. *Cf. West Ohio Gas Co. v. Public Utilities Comm'n of Ohio*, 294 U.S. 63, 75 (1935) (extraordinary expenses are a charge upon capital rather than a charge upon income); *Taylor v. Mayo*, 110 U.S. 330, 338 (1884) (improvements are extraordinary expenses). Indeed, the Farm Financial Standards Council (FFSC) urges that in order to provide an accurate picture of net farm income, the concept should include all gains and losses from disposal of farm capital assets *unless* those gains or losses qualify as an extraordinary item.[3]

---

[3] *Financial Guidelines for Agricultural Producers*, at 22 (FFSC, Dec. 1997). According to the FFSC, in order to be an extraordinary item, the transaction should be:

> a. *Unusual in nature.* The underlying event possesses a high degree of abnormality, and is of a type clearly not related to, or only incidentally related to, the ordinary and typical activities of the enterprise.
>
> b. *Infrequent in occurrence.* The underlying event is of a type that would not reasonably be expected to recur in the foreseeable future, taking into account the environment in which the enterprise operates.

*Id*.

Based upon FAS's position in *Do*, the FAS would regard extraordinary gains as "non-fishing income" events. Logically, such ought, therefore, to apply to extraordinary losses as well. Indeed, the regulation itself does not include *all* income but excludes "payments under this part[.]" *See* 7 C.F.R. § 1580.102. On the other hand, the capital gain in *Do* was not reported as income, extraordinary or otherwise, on the relevant Schedule C to IRS form 1040. In that case, the argument was for *inclusion*, not exclusion, of a reported (albeit in another section of IRS form 1040) event with respect to the relevant Schedule C that FAS examined for net fishing income. Here, the Court confronts a plea for *exclusion* of items that were included on a Schedule C, which Mr. Selivanoff took as deductions in achieving the net profit for 2001 that he reported to the IRS. But, the relevance of such distinction is not discernable. If it is true, as Mr. Selivanoff apparently argues, that his net profit for 2001 is not representative of a "normal" year's profit, the obvious question would be, what is a "normal" year? One answer might be provided by the law of averages, which would point in favor of using the average or weighted-average of several financial periods. *Cf.*, *e.g.*, 19 U.S.C. § 2401e (TAA petition for eligibility is based upon a five-year average of price data concerning the adversely affected commodity). Such a solution, however, would be a legislative matter for Congress and not this Court. On the other hand, in comparing the net profit of the claim year to the net profit of the pre-adjustment year, FAS is merely complying with what is statutorily required of it. *See id.* § 2401e(a)(1)(C). It is, nonetheless and as previously mentioned, a matter of some import that FAS *determine* whether items that have been reported to the IRS are appropriate to the determination of net fishing income. A particular IRS form 1040's Schedule C may encompass two lines of business, one fishing and the other non-fishing, just as it may embody extraordinary income

and deduction items, which may or may not be pertinent to a determination of net fishing income. But, as *Rood* and like cases re-affirm, it is only the net fishing income that is relevant. *See*, *e.g.*, *Rood*, *supra*; *Cabana*, *supra*. The government, perhaps therefore, emphasizes that the circumstances about which Mr. Selivanoff complains had the effect of reducing his tax liability in 2001 in comparison with 2003. *Cf*. Pub. R. 11 *with id*. at 13. That is true, but disclosure for the purpose of taxation is different than discovery by FAS for the purpose of determining benefits. There may be overlap of income and deductions for both purposes, but income and deductions relevant to the latter are not necessarily as all-encompassing as the former.

FAS's regulation, 7 C.F.R. § 1580.102, states that net fishing income shall be the net profit or loss reported to the IRS.[4] If this is read to imply subdelgation of the determination of net profit or loss to the IRS, a subdelegation of authority to another agency is not necessarily objectionable as a general matter, but without express congressional authorization therefor, its parameters must be discerned through the statute's purpose. *Assiniboine & Sioux Tribes of Fort Peck Indian Reserv. v. Board of Oil and Gas Conserv. of State of Montana*, 792 F.2d 782, 795 (9th Cir. 1986); *Rodriguez v. Compass Shipping Co.*, 617 F.2d 955, 959 (2d Cir. 1980), *aff'd*, 451 U.S. 596 (1981). *See*, *e.g.*, 5 U.S.C. § 1104 (delineating subdelegation authority of Director of Office of Personnel Management). Any permissible subdelegation may not exceed the agency's own delegated authority from Congress. *Vierra v. Rubin*, 915 F.2d 1372, 1378 (9th Cir. 1990). In this instance, the purpose of the statute is to assist agricultural commodity workers in the face of intense import competition

---

[4] As noted in *Trinh* (*supra*) however, the rule also permits "(i) Supporting documentation from a certified public accountant or attorney, or (ii) Relevant documentation and other supporting financial data, such as financial statements, balance sheets, and reports prepared for or provided to the Internal Revenue Service or another U.S. Government agency. . . ." 7 C.F.R. § 1580.301(e)(6).

affecting their livelihood, and Congress has clearly directed the Secretary of Agriculture to *determine* net farm (fishing) income. If the regulation is read as implying that FAS merely accepts and does not subject a particular net profit (loss) line item—as reported to the IRS, in the convention its forms require—to further analysis in light of an applicant's claims with respect thereto, then FAS has, in effect, subdelegated the determination of net farm or fishing income to the IRS, in derogation of its statutory mandate. *See* 19 U.S.C. § 2401e(a)(1)(C). *See, e.g., U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 564-568, 360 U.S.App.D.C. 202, 212-216 (D.C. Cir. 2004), *cert denied*, 543 U.S. 925 (2004) (FCC can not delegate unbundling decisions to state utility commissions); *Save Our Wetlands, Inc. v. Sands*, 711 F.2d 634, 641-43 (5th Cir. 1983) (agency record requires proof of review and consideration prior to agency's reliance upon work product of others); *Sierra Club v. Lynn*, 502 F.2d 43, 59 (5th Cir. 1974), *cert. denied*, 421 U.S. 994 (1975) (third parties may participate in preparation of environmental impact reports as long as agency does not abdicate responsibilities and rubberstamp their work product). *Cf. Apotex, Inc. v. Thompson*, 347 F.3d 1335, 1349 (Fed. Cir. 2003) (acknowledging principle that subdelegation must derive from lawful authority). Contrary to the government's implicit premise that it is sufficient for FAS merely to adopt a summary line item reported to the IRS, the regulation does not preclude argument on and interpretation of all relevant data pertinent thereto but reflects congressional intent that FAS determine net fishing income through consideration of such data.

FAS's negative determination letter to Mr. Selivanoff states simply that his application for TAA benefits was denied "because the documentation you provided the Farm Service Agency indicates that your 2003 net fishing income was greater than your 2001 net fishing income." Pub.

R. at 62. The letter does not detail *why* that is so. Further, the Court cannot discern from the record whether FAS actually undertook analysis to determine net fishing income, or whether it simply relied on a comparison of the bottom-line items that were reported to the IRS, notwithstanding that Mr. Selivanoff clearly raised the claim that he had significantly higher expenses in 2001 due to repairs to his boat. *See* Pub. R. at 3. On the one hand, the boilerplate ultimately issued as FAS's negative determination mirrors the paucity of Mr. Selivanoff's own explanation, at the outset of his application, regarding such damages (which he here asserts were due to a storm that left him "lucky to be alive"), however it was at least clear, at the time, that he was contesting the impact of such expense reported on his 2001 net income or profit. With neither an accounting nor legal background, Mr. Selivanoff's application at least asserted sufficient facts to raise a colorable issue that bore on the determination. Yet, other than the checked and dated boxes completed by the local Farm Service Agency office on Mr. Selivanoff's application and its final negative determination addressed to him, *see* Pub. R. at 1 & 62, there are no indicia of further contact with Mr. Selivanoff and not a single note or comment to indicate FAS's consideration of Mr. Selivanoff's application. In short, the Court cannot state with confidence that this record reflects a determination made with the "utmost regard" for Mr. Selivanoff's interests.[5] *See Trinh*, *supra*, 395 F. Supp.2d at 1267 and cases cited. Consistent with this opinion, the matter therefore requires fuller investigation, consideration and explanation.

---

[5] *Post hoc* rationalization will not do. *E.g. ILWU Local 142 v. Donovan*, 10 CIT 161, 164 (1986). "[A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency." *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). Although Mr. Selivanoff did not initially raise the depreciation and restructuring items ('grub and insurance' and crew costs) before FAS, this is not fatal to these claims because it appears the investigation was inadequate in any event. The government argues that such costs have been properly accounted for; however, FAS should consider these items in the first instance, as it would not be prudent at this juncture for the Court to comment on their impact on the determination.

### *Conclusion*

For the foregoing reasons, it is appropriate to remand this matter to the Foreign Agricultural Service for further proceedings not inconsistent with this opinion. On remand, FAS shall determine (a) whether Mr. Selivanoff's points, each individually, are in the nature of ordinary or extraordinary deductions, and (b) if the latter, whether each item is to be included or excluded from the determination of net fishing income, and file its remand results with the Court within 45 days from the date of this opinion, whereupon the parties may have 15 days to make any comments with respect thereto, and no rebuttal without leave. If FAS is satisfied as to the veracity of Mr. Selivanoff's assertions and considers that additional fact finding is unnecessary in order for FAS to make its full and considered determination, with the utmost regard for Mr. Selivanoff's interests, then it need not reopen the administrative record, but it shall also consider any additional information that Mr. Selivanoff may choose to submit, unsolicited, to FAS in order to support his claim, should he so choose. In this regard, Mr. Selivanoff is advised to contact counsel for the defendant for further instructions on how to do so.


SO ORDERED.


                                                    /s/  R. Kenton Musgrave
                                                  R. KENTON MUSGRAVE, JUDGE


Dated: April 18, 2006
          New York, New York